Good morning everyone and welcome to the Ninth Circuit. Judge Bennett and I are pleased to welcome Judge Rakoff, a district judge for the Southern District of New York. Welcome. It's a great pleasure to be here. I saw something in the sky this morning that seemed very unusual. I think it was called the sun. But it's a great pleasure to be here. We'll call the cases in the order on the day sheet. The first case, Zavala-Borja v. Barr is submitted on the briefs. The second case, Jacinthe v. Barr is also submitted on the briefs. And the first case for argument is Edward Stevens v. Terema Carlin. Good morning. May I please the court. My name is Lamont Anderson. I represent the appellant, Warden Carman. I would like to reserve three minutes of time for rebuttal, if I might. Because the Idaho Court of Appeals expressly declined to address the factual finding by the magistrate regarding the removal of the eyes, the parties and the federal magistrate in this case were permitted to look through the Idaho Court of Appeals decision and look to the post-conviction court's finding regarding those eyes. Alternatively, any argument regarding looking through has been waived by, for that matter, both parties. Because both parties agreed, and the magistrate relied upon that agreement, that we could look through and go directly to the post-conviction court's finding. Now, the reason that we can look through in this particular case is because this is not a situation where the Idaho Court of Appeals expressly declined to or expressly rejected the post-conviction court's finding regarding the eyes. Can I just clarify for a minute? You're not then, you're waiving the argument, or you're not raising the argument, that the Idaho Court of Appeals holding was not an objectively unreasonable application of Brady. So you're agreeing that we're reviewing this de novo, not under a deference. Is that correct? No, that's not correct, Your Honor. This case is driven by 2254D2, and that's the findings by the post-conviction court. If the finding by the post-conviction court is correct, that the eyes were taken at the time of the autopsy, there can be no D1 analysis because there was nothing exculpatory that was withheld. That's the entire underlying basis of this case. The reasoning of the Idaho Court of Appeals was even assuming that Casey's eyes were removed after the embalming. The prosecutor didn't know the evidence was exculpatory, so there's no Brady violation. And so are you arguing, because that was not in your briefs, are you arguing that the Idaho Court of Appeals ruling on the Brady issue was not an unreasonable application of Brady? No, Your Honor. In fact, I believe it was an unreasonable application. Because if you look at the analysis of the Idaho Court of Appeals, they were basically saying, well, the prosecutor didn't know that it was exculpatory, and therefore it didn't have to be disclosed. And that just isn't the law under Brady. That's really what the Court of Appeals held. And that's not the law under Brady. It doesn't matter what the prosecutor thinks of the evidence, whether the prosecutor thinks it's exculpatory or not. The evidence has to be disclosed because the defense knows, based upon its theory of the case, what it believes to be exculpatory. Okay. So we're looking then at the application of Brady de novo. And your argument, if I understand it, is that the Idaho State Trial Court's determination that the eyes were removed at the autopsy is presumed correct. But the magistrate judge said that Stevens had rebutted that by clear and convincing evidence. Why isn't that correct? Your Honor, the reason that's not correct is because the magistrate relied primarily upon the Marchaway report. In fact, the magistrate said, if I recall it correctly, that that was the most contemporaneous evidence available. The evidence regarding the removal of the eyes was ambiguous. The problem was that Dr. Slaughter testified at the motion for new trial, I believe it was somewhere between 8 to 10 years later, and could not definitively state the exact time he removed the eyes. So I'm having trouble why we're even concerned about that finding, given the overwhelming evidence of guilt and the fact that there was plenty of evidence from the defense about the folds and all like that, independent of that. So it seems to me that it might be harmless error, even assuming contrary to what you're arguing, even assuming that the eyes were taken out later or whatever. Your Honor, the problem that I have with a harmless error analysis is that we're talking about Brady. And, of course, there are three elements to Brady, and that is, number one, that there has to be something exculpatory or impeaching. It has to be withheld, and it has to be material. Materiality is determined based upon whether this court can have confidence in the outcome of the verdict. And haven't you explicitly argued in your briefs that even if the eyes were taken out at the mortuary, that there still should not have been a reversal? That the writ should still not have been granted? That is absolutely correct, Your Honor. That's what Judge Rakoff was saying because of what in the State's view is the overwhelming evidence, irrespective of when the eyes were taken. That was the position in your briefs, right? Absolutely, Your Honor. And that was because I recognize that the magistrate reviewed the issue of materiality de novo, but the magistrate overlooked just an extraordinary amount of evidence that was presented by the State in this case, particularly the evidence regarding the 9 centimeter by 3 centimeter skull fracture. While it was mentioned by the magistrate, it was certainly not given a great deal of weight. And when you stop and look at this, the basis of the State's case was not the macular folds, which is really what the magistrate relied upon because the evidence regarding removal of the eyes would have gone directly to the macular folds and whether they existed. The State's position on that is that the occipital bone being split right down the middle of the evidence was very strong that this could not have happened in the way that the defense theory claimed. That was a huge part of the State's case, Your Honor, absolutely. It was – I just – I realized that there was other evidence to rebut that testimony, but that was extraordinarily a large part of the case. The other thing that the magistrate overlooked was the very low pH level and the low temperature when Casey was first brought to St. Alphonsus. No mention of it at all when you look at the materiality prong of this case. There was an extraordinary amount of evidence in this case establishing that Stevens committed this murder and that it wasn't just a fall from the stairs where he landed on a hardwood floor. And that's our primary problem with the magistrate's finding, de novo, is that there was evidence that was absolutely overlooked or was not given enough weight, I guess you could say. Now, I do want to talk a little bit about the waiver issue because of the court's order to do that. And, of course, it is the State's position that there was, if you even need to get there, that there was a waiver by both parties because the look-through doctrine is not a product of AEDPA. It's a judicial creation. It was, I believe, first talked about in Harris, but, of course, Yeltsin was the case that first really discussed the look-through doctrine. And what happens when you have a silent denial, as in California? We don't have those in Idaho. But when can you look through an appellate court's decision and look on through to the trial court of the post-conviction court's decision, as in this case? The other problem that I have is that even if you look at Amato, Amato was an AEDPA case. It focused up on 2254 D-1, as I recall. But if we get past 2254 D-1 or D-2, then we get to 2254 E-1. And there's no case that says that you can't look through when it comes to E-1. I believe it was in Amato. I'm not 100% sure on that, where the court talked about the Williams decision and Justice O'Connor's decision in Williams, or concurrence, excuse me, and talked about the actual language of 2254 D-1 and D-2 and whether it's plural decisions or whether it's a singular decision. But we don't have that issue in E-1. It says state courts. And so, really, the look-through doctrine hasn't been addressed in the context of 2254 E-1. I would also note that I believe that the waiver issue is particularly, well, the judicial estoppel doctrine is particularly consistent with the idea that the parties have waived in this case. Both parties said you could look through. The magistrate relied upon that, and certainly Stevens would receive an unfair advantage, particularly at this point in the litigation. We've spent years, literally years, assuming that we could look through to that post-conviction court's finding. And everybody did it. The magistrate did it. And I would submit that if we can't, if the law really is that we can't, then there has been a waiver. I realized what was said on Amato and its follow-up. I believe it was Hernandez. But I believe that Amato and Hernandez both apply to 2254 D-1 and D-2. And, quite frankly, the other problem, as I mentioned in my supplemental letter brief that I have with Amato, and I don't know that this Court can do anything about it, is that in Miles, the Court specifically said that the AEDPA as a whole could be waived, by the State at least. I don't know why it couldn't be waived by the defendant. And Amato didn't overrule Miles. And so arguably we have a problem within the circuit, because Miles has not, as near as I could tell from my research, has not been reversed, has never even been mentioned in the context of whether there's a waiver or not. I have a sort of unrelated question. What was the reasoning of the magistrate judge to release Mr. Stevens on bail? Your Honor, I don't know the answer to that. The State was very, very concerned about that, because I can represent to the Court, it's not in the record, obviously, but I can represent to the Court that Mr. Stevens is going to be retried. I've spent an enormous amount of time on the telephone and in person with the prosecutor that's handling that case. And I can absolutely guarantee that Mr. Stevens is going to be retried, irrespective. Unless you win on this appeal. Unless we win on this appeal. That is absolutely correct. And with that, Your Honor, I would ask that this Court reverse the magistrate and remand this case to allow the magistrate to address the additional claims that he did not address. Well, I'm sorry. Yes. Let me go to that point. If we were to agree with you that this case stands or falls on either D2 or E1, what would be the need to remand this case? Because there are at least — I didn't bring a copy of the petition, Your Honor, but I know that there's an ineffective assistance of counsel claim that was not addressed. So there are unadjudicated claims. Yes. The magistrate's entire decision was based upon a single claim. That was the Brady claim. And there are some other claims that were not addressed by the magistrate. Yes, Your Honor. Thank you. Good morning, Your Honors, and may it please the Court. My name is Dennis Benjamin. It's my great privilege to represent Ed Stephens today. To go to your question, Your Honor, the magistrate did release Mr. Stephens on bond. Ninth Circuit authority allows him to do that within his discretion. I have another case, probably about five or six years ago, called Groob, where Judge Windmill did the same thing. I can tell you that Mr. Stephens posted his bond, and he is in compliance with the rules set forth by the magistrate. I was just curious if the magistrate gave his reasoning for that, that the defendant would be retried given the more or less self-evident risk of flight in these situations. I just wondered what the magistrate had said. Well, in state court, if he gets retried and he's entitled to bond in Idaho in state court, only capital cases are non-bondable. So he would be entitled to a bond even if he were retried, and it's not uncommon for people to be out on bond, even in serious cases like this. I know it's less common in federal court. Did he have a bond prior to the first trial? They set a bond. He was not able to make it. It was too high for him, but they did set a bond. Your Honors, just sort of taking a step back, I want to say that this is really sort of a complicated case factually and legally, but one thing is clear. The mortician saw and noted that Casey's eyes were still present prior to the embalming. Well, I mean the state takes issue with that characterization, and the trial court who conducted the post-conviction hearing and had the ability to judge the witnesses said that on that point the testimony was ambiguous, didn't he? She was the trial. She, sorry. Yeah, she. I do not believe she reached that question. When you look at Mr. Reinke's testimony, he says that he knew the eyes were brown because he looked at them. That seems unambiguous to me. The trial court, the PCR trial court said that its ruling was that Stevens failed to prove a preponderance of the evidence that Casey's eyes were removed after the embalming at the autopsy. So that means at least the evidence was in equipoise at a minimum. That's right, Your Honor, and I think that's a very important point because the trial judge, the state trial judge does not make a ruling that the eyes were removed post-autopsy, I mean were removed at the autopsy. There is no finding for this court to defer to that the- I thought the trial court said that, or the PCR court said that the state's version of the events was more likely and found factually that the eyes were likely removed or were removed at the autopsy. No, the state trial court said that we had failed to meet our burden of proof and the most logical explanation was that the eyes were still in place at the time of the autopsy. Now, she does make a comment about probabilities, but we don't know if she's talking about a 51% probability or a 35% probability. But ultimately the reason she denied the motion was because she found that since the eyes were removed at the autopsy, there was no Brady evidence to turn over, right? She did not find that the eyes were removed at the autopsy. But she found there was no Brady evidence to turn over, right? She found that I did not prove, I being Mr. Stevens' counsel, I did not prove by a preponderance of the evidence, which was my burden at the state PCP, that the eyes were not removed because I bore the burden of proof. And that's quite a different posture than a positive finding that the eyes were removed, which she never makes. No court has ever made that finding. Did the jury send out any notes relating to this issue at all? Not that I can recall, Your Honor. Because the point that I'm still having difficulty with is why this matters. There was extensive evidence that Stevens had been physically and verbally abusing Casey for months. There was overwhelming evidence that Casey's skull fracture could not have been caused by a fall down the stairs, but that it was consistent with his head being struck. There was evidence that Stevens waited a significant period of time after Casey's injury before calling 911. There was plenty of evidence that Stevens gave inconsistent statements to investigators. There was evidence that Stevens' demeanor at the time he was confronted about this was unusually unemotional and detached. There was also evidence that you introduced from Dr. Thiebaud who testified that macular folds are not caused by shaking. There was evidence you introduced that O'Connor testified that no one knows how macular folds occur. So there was, it would seem, and this is why I'm putting it to you so you can respond. On the one hand, overwhelming evidence of guilt independent of this issue. And second, that you had raised on this specific issue significant material that the jury could have easily disregarded this issue altogether and not even reached it. And that's why I asked whether they sent out a note. Well, I don't think that they, well, I was not trial counsel, so this is just my speculation based on the record. But the evidence, the defense evidence at the trial regarding the macular folds was extremely weak. And the state actually just makes fun of it in closing argument. On the other hand, the testimony from Dr. Crawford, who the state, of course, argues and in fact is highly credentialed and is a very persuasive expert witness, was quite confident in his testimony about the macular folds. Now, your recitation of facts in the record is all true so far as it goes. But there was a defense case also put on. And an important part of the defense now when you're reviewing the materiality question de novo is that the 8-centimeter skull fracture is not right. That is in error because we know through factual development at the post-conviction petition proceedings that that skull fracture is only 3 to 4 centimeters long. So every single state witness who testified that an 8-centimeter skull fracture cannot be created by a fall down the stairs, that testimony is of very limited value now because, in fact, according to a Stanford pediatric radiologist who we found in post-conviction, the skull fracture is half that size. So what that does is that that corroborates and supports the defense case, the defense case, because we put on expert witnesses. We put on a biomechanical engineer. We put on a doctor who both said that a skull fracture even of 8 centimeters, which is quite substantial, could be caused by a fall down the stairs. Now, the jury decided not to believe that apparently, but that's not the truth. The truth is that this skull fracture is only 3 to 4 centimeters long. So the crux of the state's argument and, in fact, why Mr. Stevens received a fixed-life sentence was because everyone thought that this injury was inflicted intentionally because the skull fracture was so large. So I'm sorry. So are you saying that the evidence that it was 3 to 4 centimeters was presented to the post-conviction court judge? Yes. And what was her comment on that? Did she have any? Her comment was that it was not an effective assistance of trial counsel to fail to find the forensic, I mean, the pediatric radiologist. So I want to very briefly, I don't want to eat up your time on this, but notwithstanding your colleague's concession, it's not clear to me why the Idaho Court of Appeals decision on the merits was inconsistent with Kyle's v. Whitley, which I think stands for the proposition that a prosecutor's duty to disclose arises when the prosecutor knows that the evidence is at a material level of importance. So I understand the waiver issue, and your counsel has candidly said he has waived it, and the Idaho Court of Appeals was wrong. But I'd like you to briefly address for me why, putting the waiver issue aside, exactly the Idaho Court of Appeals decision was wrong and why it's inconsistent with Kyle's. Well, it's wrong because we know that state actors had knowledge. If we assume that the eyes were removed post-embalming, we know that state actors knew about that because Joe Miller and Jim Miller make notes of it. Joe Miller says, I recall someone going to the funeral home and getting the eyes. That person, the only person that could be would... Excuse me, did Joe Miller say that or did Jim Miller report that Joe Miller said that?  But Joe says he had no recollection of that when he testified, is my recollection. That's right. So his contemporaneous statement is that he recalled. At the hearing years later, he says he didn't. He doesn't recall that. But that was in Jim Miller's report. That was in Jim Miller's report, which was introduced without objection. But to return to your point, so we know state actors have this, and we know that the prosecutor, from her notes, is concerned about the chain of custody of the eyes. So the chain of custody is a traditional way to impeach what is happening, the integrity of the evidence. We have experts who say, Dr. Plunkett says, well, we don't really know anything about macular folds. So it's a pretty weak argument that the defense is putting up at trial. So if we can show that there is some sort of break in the cause and the chain of custody, that's quite a powerful argument for us because they can't even prove that the eyes that Dr. Crawford examined were the eyes that were removed because they have no chain of custody showing that. So that not only affects the macular folds, but it affects all of Dr. Crawford's testimony because now there is a question about what he is actually examining because we don't know, one, whether they're even the eyes, and two, we now know that the embalming creates artifacts, creates artifacts that impeach the testimony of Dr. Crawford. And Dr. Crawford's testimony is really sort of the crux of this argument, I mean, the case. And this goes to the materiality question, Your Honor. This was a hotly contested case. You know, we have evidence that other injuries could be, you know, C.W. is not the only person who has care. I mean, Ed is not the only person who has care of C.W., right? There are other people in the family. There is a biological father. There is a biological father's family. There is a biological mother. There are a lot of people to talk about that. And so, and we have expert testimony that the fall could have caused these injuries that we see. So we have a case that is very close from the, because we put on counter evidence to everything that the state puts on, except really the macular folding. Now, remember, Dr. Crawford in the macular folding said that this is, there's only been two cases in the history of the world where macular folding was found in a non-shaken baby case. So he's saying, don't even worry about this other evidence. This other evidence is irrelevant. These macular folds prove to a 99.99999% probability that this was a shaken baby. So does that matter given your position that the abuse, because apparently the child's body was bruised from head to toe, that the abuse could have taken, been done by some other person? So does it really change that position? What difference does that make? It makes a lot of difference because the state's theory is what is now called, unfortunately, and excuse me, a shaken slam case. So Ed, for some unknown reason, unexplained reason, goes into a rage, even though there's testimony that he's a good father. He goes into a rage and shakes the baby. And that's why the shaking is so important. He shakes the baby in a rage and he hits the baby's head against the side of the bathtub. I'm sorry, this is gruesome, I know. But my point is, without the shaking, the shaking is what the state's whole theory of the case is, is that he had to have shaken the baby and then slammed the baby. And that's how the injuries were caused. So without the macular folding, where Dr. Crawford says to a 99% certainty this is a shaken baby case, I trust your de novo review of the materiality question because this is quite a close case when you consider the entirety of the evidence. Thank you. Thank you. We have some time for rebuttal. Go ahead. Did Dr. Crawford say 99%? No, Your Honor. And, in fact, my recollection of the testimony was Dr. Crawford kind of equivocated on it. And the problem that I have with counsel's argument is that if I heard him correct, he said the evidence regarding the macular folds was, quote, extremely weak. Well, it certainly wasn't the focal point of the state's case. But the point is that the removal of the eyes post-embalming only affects the question of the macular folds. And if you remove the macular folds, there is still just an extraordinary amount of evidence. Now, I realize that counsel mentioned some of the evidence that they put on, I believe, at post-conviction regarding whether the skull fracture was 3 to 5, excuse me, 4 to 5, whatever it was, versus 9 centimeters. The problem that I have with that is that when you look at Brady, you certainly look at the cumulative evidence that was presented at trial. But then you look at the evidence that should have been included, which would have been, that the eyes allegedly were post-embalmed. We don't look at this other evidence that was presented on the IAC claim. That's not part of the materiality finding. We look at what was at trial, and we look at what was excluded, and how those cumulatively, whether those cumulatively would still allow this court to have confidence in the outcome of the verdict. Regarding the issue of the mortician's testimony, the problem that I have with that testimony, Your Honor, is that he wouldn't say it like Dr. Slaughter did. But he didn't have an independent recollection of anything. He was relying upon his report. And there are a number of mistakes in that report that we detailed out in our briefing. And, in fact, there's another report that was from Mr. Scherner, who examined the body right after it was taken from St. Luke's to, I don't remember if it was the morgue, but he examined the body prior to the autopsy, and his report says that the eyes were hazel. And now that's a real problem, because he says in his report very specifically that he opened the eyes and saw that they were hazel. You won't find that in the Marcher Way report. All you see is eyes brown. And the mortician could not explain how he knew that. He assumed that he knew that by opening the eyes, but he didn't have an independent recollection of that, Your Honors. Respectfully, I would again ask this Court to reverse and remand for determination on the other claims. Thank you. We thank both sides for their argument. The case of Stevens v. Carlin is submitted.
judges: Ikuta, Bennett, Rakoff